APR 11 1977

MEMORANDUM FOR THE HONORABLE ROBERT J. LIPSHUTZ
Counsel to the President

Re: Chinese Government's Assumption of Expenses of
U.S. Delegation

Attached is our memorandum on the question whether there is any legal obstacle to the Government of the People's Republic of China furnishing lodging, meals, and transportation to members of an official delegation who will be visiting that country. I am also attaching a copy of a telegram which we have received from Representative Caputo requesting our opinion on the same subject. With your approval we would like to reply to this telegram by simply furnishing Representative Caputo with a copy of the attached legal memorandum to you.

I will wait to hear from you before taking any further action on Representative Caputo's request.


John M. Harmon
Acting Assistant Attorney General
Office of Legal Counsel


Attachments (2)

APR 1 1 1977

MEMORANDUM FOR HONORABLE ROBERT J. LIPSHUTZ
Counsel to the President

Re: Chinese Government's Assumption of Expenses of
U.S. Delegation

You have asked for our views as to whether there is any legal obstacle to the Government of the People's Republic of China furnishing lodging, meals, and transportation to members of an official delegation who will be visiting China. The delegation will include Members of Congress and the President's son. 1/

Article I, Section 9, Clause 8 of the Constitution provides:

> No Title of Nobility shall
> be granted by the United States:
> And no Person holding any Office
> of Profit or Trust under them,
> shall, without the Consent of the
> Congress, accept of any present,

---

1/ During a debate on the House floor on April 6, 1977, Congressman Brademas stated that the official expenses of Members of Congress would be paid from counterpart funds of the United States. 123 Cong. Rec. H 3145. Congressman Brademas' office confirmed this by telephone on April 7, 1977. To the extent United States funds are used, there would appear to be no legal problems.

Emolument, Office or Title,
of any kind whatever, from any
King, Prince or foreign State.

The purpose of the prohibition against the receipt of gifts
is to prevent foreign influence over officers of the United
States.   2 Farrand, The Records of the Federal Convention
of 1787 (1937), at p. 389; 24 Op. A.G. 117 (1902).

Congress has enacted legislation to implement the
constitutional provision.  See 5 U.S.C. § 7342.  In this
section, Congress has consented to the acceptance of gifts
from foreign governments by Federal officers and employees
in two limited circumstances: (1) where the gift is of mini-
mal value 2/ and tendered or received as a souvenir or mark
of courtesy; and (2) where the gift is of more than minimal
value but its refusal would be likely to cause offense or
embarrassment or otherwise adversely affect the foreign re-
lations of the United States.  In the former situation the
recipient may retain the gift, but in the latter it is deemed
to have been accepted on behalf of the United States and must
be deposited with the Chief of Protocol for use and disposal
as property of the United States under implementing State
Department regulations, 22 CFR, Part 3.  Although the statu-
tory provision does not expressly so state, it is implicit
that any gift not covered by either of these two consent
provisions may not be accepted.

The limitations on acceptance of gifts from foreign
governments apply to Members of Congress and their staffs,
as well as Executive Branch personnel travelling with the
party.  See 5 U.S.C. §§ 7342(a)(1)(A) and (E); 22 CFR 3.3.
(a).  The implementing statute also applies to a member of
the family and household of any of the officials covered by
the statute.  5 U.S.C. § 7342(a)(1)(F); 22 CFR 3.3(a).

_____

2/  "Minimal value" is defined in applicable regulations
as less than $50.  22 CFR 3.3(e).

Since the statute applies to the President, 5 U.S.C § 7342 (a)(1)(D), the President's son and his family are also subject to the restrictions on the receipt of gifts from foreign governments.

We do not believe that the constitutional and statutory provisions just discussed should be read to prohibit the Chinese Government from assuming the expenses of the members of the delegation. The Constitution provides that "no Person . . . shall . . . accept of any present . . . of any kind whatever . . ." Although the term "present" might appear to connote a tangible item, we believe that a foreign government's furnishing of travel and subsistence to an individual officer of the United States would be prohibited by the Constitution as well. 3/ Similarly, it is our opinion that travel and subsistence furnished to an individual by a foreign government would constitute a "gift" under the statute. See 5 U.S.C. § 7342(a)(3). But in the present case we do not believe that the "present" or "gift" of travel, lodging, and food will be "accepted" by individual members of the delegation within the contemplation of the Constitution or the statute.

The trip is being made by an official delegation, not by individual Members of Congress or Executive Branch employees travelling on their own behalf. Food, lodging, and travel will be accepted by individuals as members of the official delegation. In this sense, the hospitality is extended as a diplomatic courtesy to the United States Government.

Moreover, if the Chinese Government did not furnish these things, they presumably would be paid for out of funds appropriated to the Congress and to the Executive Branch. Thus, it appears that the real beneficiary -- in purely

3/ The additional phrase "of any kind whatever" indicates that the clause should be given a broad construction.

- 3 -

monetary terms -- of any gift or present involved is the United States Government, not individual members of the delegation.

This is an important distinction, because the constitutional prohibition has been construed to prohibit only gifts made to individual officials, not gifts made to the United States Government. For example, one opinion of the Attorney General indicated that gifts of portraits to be presented to the Naval Department and the Naval and Military Academies could be accepted on the ground that they were made to the Government. 24 Op. A.G. 117, 118 (1902). The statute implementing the constitutional prohibition suggests this same conclusion in providing that gifts of more than minimal value given to an individual employee are deemed to have been accepted on behalf of the United States. See 5 U.S.C. § 7342(c). We see no reason why this distinction between presents given to individuals and presents given to the United States should not apply to official diplomatic travel, such as that involved in the present case.

In this connection, we have been advised by the office of the State Department's Assistant Legal Adviser for Management, which has responsibility for advising the Chief of Protocol on questions arising under the foreign gifts statute, that 5 U.S.C. § 7342 has not been construed to prohibit a foreign government from paying expenses of Government employees travelling to another country if the agency approves the arrangement in advance for an official agency mission. Presumably this same rationale would apply to trips by Members of Congress where there has been an appropriate determination that the trip is official.

We were also informed by an assistant to Congressman Brademas that the Comptroller General advised Speaker Albert in an unpublished letter dated March 12, 1975 (B-180742), that members of a previous congressional delegation to China could be furnished the same general type of services as those at issue here on the theory that the

- 4 -

real benefit was to the United States Government rather than to individuals. 4/ Congressman Brademas' assistant stated that the Comptroller General's letter placed particular emphasis on the diplomatic considerations involved. 5/

---

4/ During the House floor debate regarding the present trip, Congressman Rhodes stated that he accompanied Speaker Albert on a trip to China at least some of the expenses of which were borne by the Chinese Government. 123 Cong. Rec. H 3145 (April 6, 1977). This was apparently the same trip.

Also, Congressman Bauman mentioned Advisory Opinion 1974-3 of the House Committee on Standards of Conduct which concluded that "acceptance of travel or living expenses in specie or in kind by a Member or employee of the House of Representatives from any foreign government is not consented to in 5 U.S.C. 7342, and is, therefore, prohibited." Id. at H 3150. The opinion states that the Department of State and the Comptroller General had been consulted before the 1974 opinion was issued. The subsequent ruling by the Comptroller General, which appears to have been accepted by the House in passing a resolution approving of the 1975 trip (see footnote 6, infra) must be read as a partial overruling of the earlier advisory opinion, at least as it applies to "official" trips to the People's Republic of China.

5/ Congressman Brademas mentioned the Comptroller General's ruling on the House floor on April 6, but stated that the ruling was that "the law was not violated by reciprocal expense arrangements" -- presumably meaning mutual agreements under which the host country pays expenses of persons visiting from the other country. There may be such an arrangement with China, but we do not believe that the reciprocity element is necessary under the theory set forth herein.

- 5 -

The distinction drawn in the past between travel and subsistence furnished to individuals and that in effect furnished to the United States Government is, in our view, a reasonable construction of the constitutional and statutory provisions. In situations in which the individual official's own agency would pay expenses if the foreign government did not, the official in theory receives no personal benefit from the foreign government. The purpose of preventing foreign influence over officials of the United States that may result from receipt of personal benefits is therefore not directly served by prohibiting the acceptance of the foreign government's hospitality. Per diem payments should of course be reduced or eliminated in such a case to the extent necessary to offset any benefits furnished by the foreign government.

We recognize that a foreign government's invitation for a Member of Congress or other officer or employee of the Federal Government to make what is termed an "official" visit at the other country's expense could in itself carry the seeds for the type of foreign influence the constitutional and statutory provisions were designed to prevent. 6/

6/ It is no doubt for this reason that the Department of State has apparently insisted, at least insofar as its own employees are concerned, that any such arrangement have prior approval. In this connection, Congressman Rhodes pointed out on the House floor that the House passed a resolution in 1975 permitting the 1975 trip to be at the expense of the Chinese Government. 123 Cong. Rec. H 3145 (April 6, 1977). We are not aware of any similar resolution in the present case. However, the means by which travel by Members of Congress is approved or deemed official is an internal concern of the House. Presumably the President's designation of his son as a representative on the trip under circumstances in which it is apparent that the Chinese Government will pay expenses furnishes analogous official approval, although we were informed by the Legal Adviser's Office that it has never addressed this precise issue.

For this reason, it would be consistent with the spirit of the constitutional and statutory restrictions for the United States Government to insist on paying the expenses of official travel abroad whenever possible, even where payment by a foreign government could legitimately be characterized as a gift to the United States rather than to the individuals involved. But where unique diplomatic concerns make such insistence inadvisable, as apparently is true in the present case, we see no objection to acceptance of the foreign government's hospitality.

John M. Harmon
Acting Assistant Attorney General
Office of Legal Counsel

- 7 -

WU6...
[...] 11:22:57 04/06...

...04 13:28:06 04/06/77
LOUTCC1147 C962302
TLX053

SPL066      [AF]130(1533)(1-016129A096)PD 04/06/77 1533
ICS IPMUA[...] WSH
11033 GOVT SUWASHINGTON DC 237 04-06 303P EST
PMS HON GRIFFIN BELL ATTORNEY GENERAL
DEPARTMENT OF JUSTICE
WASHINGTON DC 20530

AS A MEMBER OF THE HOUSE COMMITTEE ON STANDARDS OF
OFFICIAL CONDUCT, I AM EXTREMELY CONCERNED ABOUT THE POSSIBILITY
THAT AS MANY AS 12 MEMBERS OF THE HOUSE AND SENATE ARE GOING TO
UNKNOWINGLY AND UNWITTINGLY VIOLATE THE CONSTITUTION OF THE
UNITED STATES AND THEIR OATHS OF OFFICE THIS WEEK BY TAKING A
TRIP TO THE PEOPLE'S REPUBLIC OF CHINA AT THE EXPENSE OF THE
CHINESE GOVERNMENT. ARTICLE I SECTION 9 OF THE CONSTITUTION
READS "NO PERSON HOLDING ANY OFFICE SHALL WITHOUT THE CONSENT OF
THE CONGRESS ACCEPT ANY PRESENT, (OR) EMOLUMENT OF ANY KIND
WHATSOEVER, FROM ANY FOREIGN STATE." IN PUBLIC LAW 90-83,

7342 AND ATTENDANT REGULATIONS CONGRESS CONSENTED TO GIFTS OF
"MINIMAL" VALUE DEFINED AS $50[...].94 [...]
CONGRESS DID NOT CONSENT TO TRAVEL AT FOREIGN GOVERNMENT
EXPENSE AND THE HOUSE ETHICS COMMITTEE CANNOT CONSENT TO SUCH
TRAVEL ON BEHALF OF THE FULL HOUSE.
THE FACT THAT THE SENATE ETHICS COMMITTEE AND A MEMBER OF
THE HOUSE SELECT COMMITTEE ON ETHICS HAVE APPARENTLY GIVEN
APPROVAL TO THIS PARTICULAR TRIP DOES NOT RELIEVE THESE MEMBERS
OF THEIR CONSTITUTIONAL OBLIGATIONS. I URGE YOU TO IMMEDIATELY
ADVISE THEM OF THE CONSTITUTIONAL PROBLEMS SUCH A TRIP MAY
PRESENT, AND AS A MEMBER OF THE HOUSE COMMITTEE CURRENTLY
CHARGED WITH RESOLVING ILLEGAL AND IMPROPER ACTIVITIES
INVOLVING MEMBERS OF CONGRESS AND FOREIGN GOVERNMENTS, I WOULD
APPRECIATE YOUR WRITTEN OPINION AS TO THE CONSTITUTIONALITY OF

THIS PARTICULAR TRIP AS SOON AS POSSIBLE.
BRUCE CAPUTO MEMBER OF CONGRESS.

BN[...]

041 18:29:15 04/06/77

145475
DEPARTMENT OF JUST[...]

APR 7 1977

O.R.O.M.

OFFICE OF LEGISLATIVE

OFFICE OF LEGAL COUNS[...]